UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                                                    Chapter 7

Daniel Gallagher aka Daniel G. Gallagher
aka Daniel Gerard Gallagher,                                 Case No.: 8-23-70994-las

                            Debtor.
-------------------------------------------------------------X

MEMORANDUM DECISION ON TRUSTEE'S MOTION
TO SELL RESIDENTIAL REAL PROPERTY

I.      Introduction

        This matter is before the Court on the trustee's motion for an order authorizing a sale

of the debtor's residential real property at auction and to distribute the proceeds of sale in

accordance with the priority distributive scheme set forth in 11 U.S.C. § 724(b)(2).[1] That

section departs from the normal rules of priority in a chapter 7 liquidation and allows

property subject to a tax lien to provide a recovery for specified unsecured priority claims

listed in § 507(a)(1)-(7) out of proceeds that would have gone to pay the tax lien. *See* 11 U.S.C.

§ 724(b)(1)-(6). The list is comprehensive and includes a "domestic support obligation," as

that term is defined in § 101(14A).[2] The trustee's proposed sale and distribution of the sale

proceeds provides a recovery to the debtor's ex-spouse, the holder of a domestic support claim

in the amount of $272,862.62, including $224,021.49 for child support and related child

---

[1] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., will hereinafter be referred to as "§ (section number)."

[2] The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is –

    (A)  owed to or recoverable by –
        (i)     a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
        (ii)    a governmental unit;
    (B)  in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regarding to whether such debt is expressly so designated . . . .

11 U.S.C. § 101(14A).

1

expenses. *See* Amended Proof of Claim No. 1-2.[3] But for the domestic support claim, the trustee would not be seeking to sell the residential real property as it is encumbered by two mortgages and a tax lien, and the property is worth less than the debts it secures.

The debtor did not oppose the sale of the residential real property. Rather, the debtor opposed the allocation of the sale proceeds claiming that the trustee's proposed distribution deprives him of his homestead exemption. His argument is two-fold. First, he maintains that the subordination of the tax lien is akin to a voluntary "give-up" or "carve-out" by a mortgagee that creates equity to which the homestead exemption attaches. Second, in the alternative, he contends that any funds that would otherwise be payable to the tax lien holder but for the subordination must be applied to reduce the domestic support obligation and that no funds can be used to pay administrative expenses of the bankruptcy estate.

In support of his first argument, the debtor cites *In re Stark*, No. 20-CV-4766(EK), 2022 WL 2316176 (E.D.N.Y. June 28, 2022).[4] There, the District Court held that it is impermissible for unsecured creditors to be paid ahead of a debtor's homestead exemption where equity is created by reason of a carve out agreement with the mortgagee as the surplus created by the carve-out agreement is equity to which a debtor's homestead exemption can now attach. The debtor thus posits that funds that would otherwise be paid to the tax lien claimant after satisfaction of the two mortgages must be paid to the debtor in respect of his homestead exemption.

---

[3] No objection to the allowance of the domestic support claim has been filed by the trustee or the debtor and it is therefore an allowed claim in this chapter 7 case. 11 U.S.C. § 502(a).

[4] The debtor also relies on a decision of the Bankruptcy Appellate Panel of the Tenth Circuit, *In re Bird*, 577 B.R. 365 (B.A.P. 10th Cir. 2017), but fails to appreciate that the facts in *Bird* are distinguishable from the facts in this chapter 7 case including that the debtor in *Bird* objected to the sale raising an issue as to whether the sale process could unfold under § 363(f). *See* Part IV. Discussion, *infra*.

The trustee argues there is no "give-up" or "carve-out" that creates equity to which the debtor's homestead exemption could attach. Rather, the allocation of the sale proceeds to pay the debtor's ex-spouse on her domestic support claim is possible through the application of the statutory subordination of the tax lien as set forth in § 724(b)(2). The subordination of the tax lien is not a voluntary "give-up" by the tax lien holder or the product of a negotiated "carve-out" from its lien. As the trustee explains, § 724(b)(2) is an automatic statutory subordination that allows for certain administrative expenses and other unsecured priority claims to be paid before any payment is made to the holder of the tax lien. The trustee, therefore, maintains that this case is not controlled by *Stark*, but rather by the clear mandate of the distribution scheme set forth in the Bankruptcy Code. According to the trustee, by reason of § 724(b)(2), the taxing authority, and neither the debtor nor the estate, shoulders the burden of certain administrative and other unsecured priority claims to provide a direct benefit to the estate, i.e., the payment of a domestic support obligation, one of the specified unsecured priority claims to which payment of the debt secured by the tax lien is expressly subordinated.

For the reasons discussed more fully below, the Court agrees with the trustee. Under the circumstances here, the statutory subordination in § 724(b)(2) is outcome determinative and there is no equity to which debtor's homestead exemption may attach. Under § 724(b)(2), the tax lien claimant is not reducing its debt thereby creating equity as occurs with a "give-up" or negotiated carve out by a mortgagee. Rather, payment of the full amount of the tax debt secured by a lien is simply subordinated to the payment of specified unsecured priority claims such as the domestic support obligation here. No surplus is created by reason of the automatic statutory subordination and the homestead exemption is not implicated unless funds remain after payment in full of the amount owed to the tax lien claimant.

The debtor's second argument fares no better as it fails to recognize both the breath and import of the statutory subordination under § 724(b)(2). The debtor contends that only the domestic support claim entitled to a priority under § 507(a)(1)(A) should be paid by reason of the statutory subordination and that no sale proceeds may be used to pay administrative expenses. This, the debtor claims, even though the clear command of § 724(b)(2) specifically provides for the payment of administrative expenses set forth in § 507(a)(1)(C). Section 507(a)(1)(C) cannot, as debtor would have it, be ignored. Domestic support obligations under § 101(14A) have priority in payment *second only* to administrative expenses under § 507(a)(1)(C), which includes administrative expenses under § 503(b)(1), (2), and (6). Payment of § 507(a)(1)(C) administrative expenses is critical because this ensures that a trustee will liquidate assets for the benefit of the domestic support claimant even though the § 507(a)(1)(A) and (B) domestic support obligation claim will consume the entire estate. It bears repeating that but for the domestic support obligation arising from the debtor's non-payment of child support and spousal maintenance in this case, the trustee would not have sought authority to sell the residential real property. Rather than turn his back on the holder of a domestic support obligation that would suffer from abandonment of the asset under § 554 or a foreclosure sale after the holders of secured claims obtain relief from the automatic stay, the trustee sought to provide a recovery to the debtor's ex-spouse in the manner permitted by the express language in §§ 724(b)(2) and 507(a)(1)(A) and (C).

Accordingly, after careful consideration of the submissions and arguments of the trustee and the debtor at multiple hearings, the Court, at the conclusion of the hearing on August 24, 2023, found in favor of the trustee and overruled the objection to the distribution scheme lodged by the debtor. Following that ruling, an order authorizing the trustee to conduct an auction sale of the residential real property and to distribute the sale proceeds in

accordance with § 724(b)(2) was entered on August 25, 2023 (the "August 25 Order").[5] The Court ruled from the bench on this pivotal issue because it was clear that the parties needed a prompt ruling in order for the sale process to move forward without delay. Absent approval of the distribution of the sale proceeds in accordance with § 724(b)(2), the trustee would not have moved forward with the sale. This Memorandum Decision sets out the factual bases and legal authority for the Court's bench ruling.[6]

II.    Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and the Standing Order of Reference of the United States District Court for the Eastern District of New York, dated August 28, 1986 (Weinstein, C.J.), as amended by Order dated December 5, 2012 (Amon, C.J.) entered in accordance with 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N) and (O) in which final orders or judgment may be entered by this Court pursuant to 28 U.S.C. § 157(b)(1).

III.    Factual Background and Procedural History

The relevant facts are not in dispute, except as otherwise noted. The debtor and Ms. Gallagher were parties to a matrimonial action commenced in 2012. The judgment of divorce dated December 3, 2015 directed the sale of the marital residence and the debtor to pay from his share of the proceeds, child support arrears due through December 31, 2013 and federal

---

[5] The debtor did not appeal the August 25 Order which authorized the trustee to conduct the auction sale and, upon closing, to distribute the proceeds in accordance with § 724(b)(2). The debtor did appeal the subsequent order of this Court entered on September 13, 2023 ("September 13 Order") confirming the results of the auction sale to the successful bidder for a purchase price of $870,000. The September 13 Order also allowed the trustee to proceed to close the sale transaction to the successful bidder and distribute the proceeds in accordance with the previous ruling set forth in the August 25 Order. Of note, the debtor did not file written opposition to the trustee's motion to confirm the results of the auction sale when given an opportunity to do so.

[6] Both the August 24, 2023 bench ruling and the August 25 Order provided that the Court may issue a written decision consistent with, and which explains further, the bases of the Court's ruling. This decision does just that. It does not change the substance of the Court's ruling.

and state tax liens he incurred in 2009 and 2010. Ms. Gallagher and their child do not reside at the real property.

   The debtor filed for chapter 7 relief under the Bankruptcy Code on March 23, 2023 ("Petition Date"), and Robert L. Pryor, Esq. was appointed the chapter 7 trustee. In his bankruptcy schedules, the debtor valued his residence at $932,600 and claimed the maximum New York State homestead exemption available under § 522(b) in the amount of $179,975. The real property is encumbered by two mortgages and a tax lien. The first mortgage is held by U.S. Bank Trust National Association, not in its individual capacity but solely as Owner Trustee for RCF2 Acquisition Trust (the "First Mortgagee") and had a payoff amount of $706,362.13 as of July 1, 2023. In his Schedule D to the chapter 7 petition. the debtor listed a second mortgage in the amount of $57,000 and several tax liens aggregating approximately $210,000 held by New York State Department of Taxation and Finance ("NYS Tax"). NYS Tax timely filed a proof of claim showing tax warrants ("NYS Tax Liens") against the debtor's interest in the real property totaling $380,540.31 as of the Petition Date.[7] *See* Proof of Claim No. 3-1. In addition, Ms. Gallagher timely filed an unsecured claim for domestic support obligations asserting priority under § 507(a)(1)(A) or (a)(1)(B) in the amount of $272,862, including $224,021.49 for child support and related child expenses.

   Based upon a Zillow valuation of $932,600,[8] the trustee estimated there would be funds available for the tax lien claimant after payment in full of the amounts owed to the

---

[7] The oldest NYS Tax warrant was docketed in Suffolk County, where the property is located, on August 23, 2013, in the amount of $206,034.26 with respect to the debtor's 2010 income taxes. The next oldest NYS Tax warrants were docketed in Suffolk County on November 9, 2015 in the amount of $164,375.95 with respect to the debtor's 2009 income taxes, and in the amount of $3,196.66 with respect to the debtor's 2012 income taxes. The fourth NYS Tax warrant was docketed in Kings County on December 21, 2017 in the amount of $1,571.35 for the debtor's 2013 income taxes. The last NYS Tax warrant was docketed on March 24, 2022 in Suffolk County in the amount of $5,361.99 for the debtor's 2016 income taxes.

[8] Although the Court does not accept a Zillow valuation at trial as evidence of the value of real property, here it serves as a starting point for the trustee's investigation as to whether there is equity available to provide a recovery to Ms. Gallagher, the holder of a domestic support obligation.

holders of the first and second mortgages. Ms. Gallagher, as co-owner of the real property, would be entitled to fifty percent of the net sale proceeds after satisfaction of the mortgage debt and the other fifty percent would be applied toward payment of the third encumbrance on the real property, to wit, the lien held by NYS Tax, leaving nothing to which the debtor's homestead exemption could attach.  However, the trustee recognized that under § 724(b)(2), payment of the debt secured by the tax lien is subordinated to the payment of certain priority unsecured claims, including a domestic support obligation claim under § 507(a)(1)(A) and (B). Seeing a viable path for distribution to Ms. Gallaher on her allowed domestic support claim, the trustee sought to administer the real property.

To facilitate the sale process, the trustee moved to retain an auctioneer to conduct a public online auction sale of the real property. [Dkt. No. 15]. The Court thereafter entered an order on May 25, 2023, authorizing the trustee to retain Maltz Auctions, Inc. as auctioneer to sell the real property. [Dkt. No. 16]. Continuing the sale process, the trustee, by motion dated June 8, 2023, sought the entry of an order authorizing him to sell pursuant to § 363(b), (f) and (h), Bankruptcy Rule 6004, and Local Bankruptcy Rule 6004-1, at public auction, both the estate's and Ms. Gallagher's interest in the real property. [Dkt. No. 17]. The trustee also obtained a stipulation with Ms. Gallagher whereby she consented, *inter alia*, to the sale of her interest in the real property under § 363(h) (the "363(h) Stipulation"). [Dkt. No. 19]. The First Mortgagee filed a limited response to the trustee's motion on July 11, 2023, noting that it does not object to the proposed sale provided the total amount due to it as of closing will be paid in full. [Dkt. No. 24]. The First Mortgagee also makes clear that it does not agree or consent to any carve out from the sale proceeds necessary to satisfy the mortgage loan or credit on account of any costs of the sale by the trustee, including commissions or expenses of the trustee's professionals, nor for the benefit of any creditors that may hold allowed administrative, priority or general unsecured claims. No response to the trustee's motion for

7

authority to conduct an auction sale was filed by the second mortgagee or the NYS taxing authorities.

The debtor did not oppose the trustee's request to sell the real property at public auction. Rather, he opposed the trustee's request to set aside any of the sale proceeds to pay administrative expenses and capital gains tax associated with the sale. In doing so, the debtor argues that under *Bird* and *Stark*, his homestead exemption must be paid in full ahead of administrative expenses if equity in the property is generated for the benefit of creditors. He maintains that equity is generated by reason of the statutory subordination of the tax lien likening that to a voluntary "give-up" or negotiated carve-out agreement. At the same time, the debtor, without equivocation, acknowledges that the mortgages and NYS Tax Liens must be satisfied in full before he can receive any distribution in respect of his claimed homestead exemption. Notably, the debtor admits at a hearing before the Court that he ultimately is seeking leverage against the trustee which would either compel the trustee to abandon the estate's interest in the real property or result in some payment to the debtor to resolve his opposition to the distribution scheme proposed by the trustee.

The trustee replied that the debtor misconstrues how sale proceeds are required to be distributed under the Bankruptcy Code. [Dkt. No. 30]. The trustee agrees with the rulings in *Bird* and *Stark,* but those cases are inapposite as this is not a situation where a secured creditor agrees to carve out funds from the recovery of its collateral for distribution to general unsecured creditors without first paying the debtor his homestead exemption. Rather, the trustee relies upon § 724(b) which specifically provides that sale proceeds subject to a tax lien may be used to pay certain unsecured priority claims before payment of the tax lien. The trustee argues that unless the real property sale generates sufficient proceeds to satisfy not only the consensual mortgages but also the NYS Tax Liens, the debtor's claimed homestead exemption would not be implicated.

The Court held hearings on the Motion on August 8, 2023, at which the trustee appeared, Richard Artura, Esq. appeared on behalf of the debtor, and Kevin Toole, Esq. appeared on behalf of the First Mortgagee. After the hearing, the Court directed the trustee to settle a proposed order authorizing the sale and approving the terms and conditions of sale. The debtor objected to the trustee's proposed order and filed a counter-order stating that only customary closing expenses, the mortgage liens and auctioneer's fees be paid at closing and the trustee must separately seek Court approval to disburse the funds pursuant to the Bankruptcy Code. As a result of the dueling orders, the Court held another hearing on August 15, 2023 and again explained in detail how § 724(b) works to provide for the payment of administrative expenses, including any capital gains taxes, attendant to administering the real property, and the payment to Ms. Gallagher in respect of her unsecured priority claim for a domestic support obligation. As the trustee noted at the hearing, absent authority to distribute the proceeds pursuant to § 724(b), there was no point in the trustee administering the real property. The Court agreed and at the conclusion of the August 15 hearing again authorized the trustee to sell at public auction the real property and to distribute the proceeds of sale in the manner expressly dictated by the relevant provisions of the Bankruptcy Code.

In the meantime, the auctioneer had noticed the proposed sale of the real property for August 15, 2023 to August 17, 2023 in anticipation of the entry of an order authorizing the trustee to hold the auction sale in advance of the August 15 auction start date. The auctioneer did not cancel or reschedule the auction when an order was not entered ahead of the August 15 auction start date.[9]

As a result, the Court held another hearing on August 24, 2023, at which the trustee and debtor's counsel appeared. The purpose of the hearing was to have the trustee provide a

---

[9] The debtor did not take issue with the auction sale having occurred during the period of August 15-August 17, 2023. It bears repeating that the debtor has not voiced opposition to the sale of the real property.

report as to what occurred at the auction. At the hearing, he represented that the highest bid received was $870,000 and, as of August 23, 2023, the amount owed on the first mortgage was approximately $732,760. The debtor, without requesting reargument, again objected to the trustee's proposed distribution of the sale proceeds. His grounds for objecting to the allocation of the sale proceeds remained the same. Although he readily agrees that the debt secured by the NYS Tax Liens must be paid in full before he may receive any distribution with respect to his claimed homestead exemption and he wants the sale proceeds applied to pay down the domestic support obligation owed to Ms. Gallagher as this obligation is a non-dischargeable debt in the debtor's bankruptcy case, he insists that administrative expenses and capital gains taxes, if any, relating to the real property sale cannot be paid ahead of his homestead exemption. The Court again took the time to discuss in detail the interplay of the relevant sections of the Bankruptcy Code, including §§ 724(b), 507(a) and 503(b)(1) which dictate distribution of the sale proceeds of estate property encumbered by mortgage liens and tax liens, how payment of certain tax liens is statutorily subordinated to the payment of specified unsecured priority claims, and how the debtor's homestead exemption is not implicated because there is no equity for the homestead exemption to attach to as there are insufficient sale proceeds to pay in full the NYS Tax Liens. The Court once again emphasized that this not a case of a voluntary "give-up" or a negotiated carve out by the tax lien holder and that the mandated statutory subordination does not reduce the amount owed to the tax lien holder thereby creating "equity" for payment of the homestead exemption. It simply subordinates payment of the secured tax debt to the payment of certain unsecured priority claim including a domestic support obligation and administrative expenses incurred to create a recovery for a domestic support claimant.

Notwithstanding multiple explanations by both the Court and the trustee regarding the statutory subordination provision set forth in § 724(b), the debtor remained steadfast and

continued to insist, without addressing application of the relevant sections of the Bankruptcy Code, that his entitlement to a homestead exemption is so inviolable that it must be paid before administrative expenses of the bankruptcy estate. While under the reasoning of *Stark* that may be the case in a voluntary "give-up" or negotiated "carve-out" agreement with a lien holder, that is not what occurred here. Despite the absence of equity to which the debtor's claimed homestead exemption can attach, and the Bankruptcy Code under the circumstances here dictating otherwise, the debtor continued his myopic approach to how the proceeds of the real property sale must be allocated.

At the August 24, 2023 hearing ("August 24 Hearing"), the Court also advised the parties that it would approve the 363(h) Stipulation between the trustee and Ms. Gallagher.[10] The next day, consistent with the Court's ruling at the conclusion of the August 24 Hearing (as well as the ruling made at the conclusion of the August 15 hearing), the Court entered the August 25 Order approving the terms and conditions of sale annexed to the trustee's motion, and authorizing the trustee to (i) sell, at public auction, the residential real property, and (ii) "distribute the proceeds of the sale consistent with and in the manner set forth in 11 U.S.C. § 724(b)(1) and (2) with respect to the treatment of the tax lien." *See* August 25 Order. The August 25 Order also scheduled a hearing for September 7, 2023 to confirm the sale to the successful bidder at the auction, and directed that any objections to the sale must be in writing and filed with the Court and served upon the trustee's counsel for receipt by no later than 12 noon on September 6, 2023. *Id.* As noted above, the debtor neither appealed the August 25 Order nor filed any written objection to the trustee's request to confirm the results of the auction sale.

---

[10] The 365(h) Stipulation was "so ordered" on August 25, 2023. [Dkt. No. 38].

Relevant to the distribution of the sale proceeds are two steps the trustee took after entry of the August 25 Order which increased the recovery to Ms. Gallaher on her domestic support claim and thereby conferred a benefit to the debtor as the domestic support obligation is a non-dischargeable debt for which he remains personally liable.

First, the trustee represented at the September 7 sale confirmation hearing that he had reached an agreement with Flagstar Bank, the holder of the second mortgage on the real property. Flagstar Bank agreed to reduce the amount of its allowed secured claim from approximately $132,000 to $75,000.[11] As a result of the trustee's efforts to resolve the discrepancy over the allowed amount of the secured claim held by Flagstar Bank, there would now be more funds available to pay Ms. Gallagher with respect to her 50% share of the net sale proceeds and to pay the NYS Tax Liens against the estate's 50% interest of the net sale proceeds.

The trustee, however, didn't stop there in his effort to provide a recovery for Ms. Gallagher on her domestic support claim which, as discussed more fully below, enjoys a privileged status in bankruptcy and is one of the specified unsecured priority claims that takes precedence over payment of the tax lien as provided in § 724(b)(2). The trustee took the following additional step, again setting his sights on providing a maximum recovery to Ms. Gallagher, the holder of an allowed domestic support claim, in a manner consistent with the express language set forth in § 724(b)(2). To that end, he negotiated and subsequently entered into a stipulation dated August 29, 2023 with Ms. Gallagher ("Modified Stipulation").

---

[11] Flagstar Bank filed a proof of claim in the amount of $132,715.62. *See* Proof of Claim No. 6-1. No objection has been filed to the second mortgagee's claim and it is, therefore, an allowed claim. 11 U.S.C. § 502(a). The debtor scheduled the amount of the debt owed to the second mortgagee as $57,000. Rather than litigate the amount of the claim, the trustee negotiated a resolution of the discrepancy and the second mortgagee agreed to accept $75,000. The debtor did not take issue with the resolution of the claim reached between the trustee and the second mortgagee. Of note, the reduction in the amount of the allowed secured claim held by Flagstar Bank did not create equity to which the debtor's claimed homestead exemption attached. Rather, it allowed additional funds to flow to the tax lien holder which in turn created additional funds to pay the domestic support claim pursuant to the statutory subordination set forth in § 724(b)(2).

Pursuant to the Modified Stipulation, Ms. Gallagher agreed to contribute to the bankruptcy estate her tenant in common ownership interest in the real property, *i.e.*, her claim to 50% of any net proceeds, irrevocably waiving her right to receive any portion of the net sale proceeds relating to her ownership interest. While Ms. Gallagher waived her 50% ownership interest in the sale proceeds, she did not waive any portion of her domestic support claim against the estate or her right to receive a distribution on her domestic support claim.  Thus, the upshot of the agreement between the trustee and Ms. Gallagher increased the amount that would be paid in respect of her domestic support claim. A "win-win" as both she and the debtor stand to benefit from payment of the domestic support obligation.

To further maximize the recovery to Ms. Gallagher, the trustee agreed that payment of the trustee's allowed fees and expenses and those of his professionals shall be limited in the aggregate to not more than (i) 50% of the net proceeds from the sale after payment of the first and second mortgage liens, plus (ii) 50% of any funds in the estate from any source other than the sale of the real property. To be clear, the amount that would be paid to the trustee and his professionals, including the auctioneer' commissions and expenses,[12] has been heavily discounted and does not reflect the actual fees that would have been incurred by the time closing on the sale occurs. The cap on professional fees that come within § 507(a)(1)(C) inures to the direct benefit of the debtor as it leaves more of the residual sale proceeds available for payment of the outstanding domestic support obligation.

IV.    Discussion

Having set forth the factual and procedural background necessary to understand the contested issue presented, the Court now turns to the parties' legal contentions albeit with a

---

[12] The debtor did not object to the payment in full of the auctioneer's commission and expenses when he submitted his counter-order authorizing the trustee to conduct the auction sale of the real property.

brief introduction as to what is the distinguishing feature of this case, to wit, the outstanding domestic support obligation and application of the statutory subordination under § 724(b)(2). Accordingly, before setting forth the legal analysis that governs both this Court's finding that the homestead exemption is not implicated and the import of the privilege accorded by Congress to payment of a domestic support obligation, the Court finds it useful to summarize the heart of this dispute and how is it that the trustee may administer an asset of the estate in which there is no equity.

As noted above, the residential real property at issue here is encumbered by a tax lien and two senior mortgages. The parties do not dispute that the residential real property is worth less than the debts it secures. Thus, it is property in which the estate has no equity. Generally, a trustee would not seek to sell over-encumbered property as there is no benefit to the estate and this Court would decline a trustee's request to do so particularly when the distribution is solely to pay secured claims and the trustee's fees and expenses. The question therefore naturally arises – why in this case is the trustee seeking to sell property in which the estate has no equity?  The answer lies in § 724(b)(2) which automatically subordinates a tax lien secured by property, allowing a trustee to sell property in which there is no equity to provide a recovery for administrative and priority claims from funds that would have been distributed to the tax lien holder. In accordance with the clear language of the statute, the specified unsecured priority claims listed in § 724(b)(2) must be paid before any amounts due on the secured tax claim[13] are paid. However, if the lone administrative expense claim is a trustee's fees and expenses and there are no other unsecured priority claims, this Court would not approve a trustee's request to administer property in which the estate has no equity even in the face of the statutory subordination set forth in § 724(b)(2). In such case,

---

[13] The claim of the NYS Department of Taxation and Finance totals $381,700.64, of which $380,540.31 is secured by the NYS Tax warrants. *See* Proof of Claim No. 3-1.

the trustee would abandon the asset under § 554(a) or the holders of secured claims would seek relief from the automatic stay under § 362(d) to pursue their rights and remedies in respect of the collateral securing repayment of the outstanding debt.

In this case, the specified priority unsecured claim that § 724(b)(2) directs that the tax lien be subordinated to is Ms. Gallagher's domestic support obligation. The domestic support obligation totals $272,862.62, of which $224,021.49 relates to child support and related child expenses. *See* Amended Proof of Claim No. 1-2. No objection to the allowance of Ms. Gallagher's domestic support claim has been filed by the trustee or any party in interest. As such, the domestic support obligation is an allowed unsecured priority claim in this bankruptcy case. 11 U.S.C. § 502(a). In an individual bankruptcy case, a domestic support claim enjoys privileged status – it is accorded the highest priority under § 507(a)(1)(A) and is second only to payment of administrative expenses under § 507(a)(1)(C) incurred to administer an asset that allowed payment of the domestic support obligation; it is excepted from discharge under § 523(a)(5); it may be enforced against exempt property under § 522(c)(1) during or even after the bankruptcy case has concluded; it is excepted from the automatic stay under § 362(b)(2); and the prepetition payment of a domestic support obligation may not be avoided as preferential transfer under § 547(c)(7). It is this privileged status that prompted the trustee to perform his duties under § 704(a)(1) to liquidate an over-encumbered asset that normally would not result in any distribution to the estate in the absence of an allowed domestic support obligation. A sale and distribution of the proceeds in the manner expressly stated in § 724(b)(2) provides to the debtor's ex-spouse, the holder of a domestic obligation in the amount of $272,862.62, a means to recover on her claim. This confers a benefit on the estate and ensures that the holder of a domestic support obligation has first call on the assets available for distribution consistent with the special priority accorded under § 507(a)(1)(A).

With this summary and legal framework in mind, the Court proceeds with its analysis as to why the homestead exemption, however sacrosanct, is not implicated here nor is there a back door impermissible surcharge by the trustee of the debtor's homestead exemption.

A. Lack of Equity for Debtor's Homestead Exemption

The debtor repeatedly confuses the statutory subordination mechanics of § 724(b) and thus questions how the trustee can distribute funds to his ex-spouse and pay administrative expenses without first accounting for a distribution on his claimed homestead exemption. In searching for an answer, the debtor chooses to ignore the express language of the Bankruptcy Code which permits, under the circumstances of this case, distribution to the holder of a domestic support claim and payment of the expenses incurred to administer the asset that created the fund for such distribution.

Under § 522, "[p]roperty for which a debtor claims an exemption is removed from the estate." *In re Laredo*, 334 B.R. 401, 410 (Bankr. N.D. Ill. 2005) (citations omitted). However, property exempted under § 522 remains liable during and after the bankruptcy case for, *inter alia*, debts of the kind specified in 523(a)(5), i.e., domestic support obligations, and "a debt secured by a lien that is . . . a tax lien, notice of which is properly filed." 11 U.S.C. § 522(c)(1), (2)(B). The debtor does not take issue with the import of 522(c) and its effect on exempt property. He also acknowledges, without any equivocation, that (i) both the mortgage debt and the tax lien must be paid before any proceeds are made available to him in respect of his claimed homestead exemption, (ii) § 724(b)(2) provides for a subordination of the payment of the tax lien, and (iii) § 507(a)(1)(A) accords a priority in payment for a domestic support obligation. As such, the debtor realizes that the only way he may receive a distribution on his homestead exemption is as follows: (1) the value of the real property exceeds the debt secured by the consensual and statutory liens encumbering the property and thus there is equity to which the homestead exemption attaches (which is simply not the case here) or (2)

through the "creation" of equity by a voluntary "give-up" or negotiated carve-out agreement with the holder of a secured claim (which likewise is not the case here but for the debtor's fiction).

In the first scenario, equity exists simply because the value of the real property exceeds the encumbrances. That equity belongs to the debtor up to the maximum amount of his homestead exemption and anything above his homestead exemption would go to the bankruptcy estate. Generally, in the absence of equity beyond the encumbrances, the trustee will abandon the real property and not seek to administer it solely for the benefit of secured creditors. It bears repeating that this scenario is not before the Court as it is undisputed that the three liens encumbering the real property exceed its value and there is no equity available to the debtor to pay his homestead exemption.

In the second scenario, a secured creditor agrees to "give up" or "carve out" a portion of the sale proceeds against which its lien attaches thereby providing funds to the bankruptcy estate for the benefit of unsecured creditors resulting in a distribution where there would otherwise be none. While under this storyline a trustee maintains that this voluntary "carve out" or "give up" confers a direct benefit to unsecured creditors, courts have nevertheless characterized the "carve out" or "give up" as newly created equity to which the homestead exemption attaches. Thus, funds are not available for payment of unsecured claims until the amount of the claimed homestead exemption has been paid in full. The District Court in *Stark* specifically instructs that any carve-out from the proceeds against which a secured creditor has an interest must be treated as equity and used to pay the debtor his homestead exemption in the first instance. *Stark*, 2022 WL 2316176, at *6. It is this scenario that the debtor confuses with the statutory subordination provisions of § 724(b). He creates a fiction that the statutory subordination mandated by the Bankruptcy Code is the equivalent of a voluntary "give up" or negotiated "carve out" by the tax lien holder to create equity for payment of a

homestead exemption. As shown in Part B below, the subordination of the tax lien in § 724(b) is far from voluntary and, most importantly, serves an express Congressional policy to accord a priority in payment of a domestic support obligation and, at the same time, incentivize a trustee to administer the estate to provide recovery to the holder of a domestic support claim.

The debtor's misguided approach in creating the fiction continues with his passing reference at oral argument to the Supreme Court decision in *Law v. Siegal*, 134 S. Ct. 1188 (2014), a case he did not cite in his opposition papers. Without any explanation as to what occurred in *Law v. Siegel* and the basis for the Supreme Court's decision, the debtor artlessly claims that subordination of the tax lien under § 724(b)(2) creates equity for his homestead exemption and a trustee is not permitted to surcharge the homestead exemption to pay administrative expenses of the bankruptcy estate. The Court is not persuaded for two reasons. First, as discussed repeatedly above and again in Part B below, the statutory subordination is not the product of a voluntary "give-up" or negotiated carve out agreement. As such, there is no equity that implicates the homestead exemption and thus no surcharge of the homestead exemption occurs by reason of the payment of unsecured priority claims in this case. Second, this is not a case where § 522(k) is controlling. Section 522(k) provides that, with limited exceptions, exempt property is not liable for payment of any administrative expenses. As a result, the Supreme Court in *Law v. Siegel* held that § 105(a) which provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," may not be used to impose a surcharge on the debtor's homestead exemption. In other words, *Law v Siegel* holds that the authority given to a bankruptcy court under § 105(a) may not be used to contradict the clear command of the statute, i.e., § 522(k). As stated clearly by the Supreme Court, "*federal law* provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code." *Law*, 134 S.Ct. at 1197 (emphasis in original). Here, the homestead

exemption is not denied; there is simply no equity in the real property for the homestead exemption to attach to, and consequently the payment of the domestic support obligation and administrative expenses incurred to create a recovery for the domestic support claimant is not the product of an impermissible surcharge of the homestead exemption. Rather, recovery and payment are the direct result of application of the statutory subordination in § 724(b)(2), a fact that the debtor continues to disregard.

B.  Statutory Subordination of a Tax Lien in Favor of a Priority Claim under § 724(b)

At oral argument, the Court explained multiple times that there is no "carve out" or "give up" by the tax lien claimant in this case to create equity to which the debtor's homestead exemption attaches. Rather, payment to Ms. Gallagher in respect of her domestic support claim and payment of the administrative expenses incurred to provide for that recovery arise solely from subordination of the tax lien under § 724(b). The Court again shall walk through the relevant provisions of the Bankruptcy Code that leads to that inescapable conclusion. A conclusion that does not run afoul of the Bankruptcy Code distributive scheme under the circumstances of this case.

The value of the real property is $870,000, the amount of the highest bid received at the auction. According to the trustee, the amount owed to the First Mortgagee totaled $732,760 as of August 23, 2023. Flagstar Bank, the holder of the second mortgage, filed a claim in the amount of $132,715.62. *See* Proof of Claim No. 6-1. As noted above, the debtor scheduled the debt to Flagstar Bank as $57,000. No objection to the allowance of this claim filed was filed. Absent resolution of the discrepancy in the amount due Flagstar Bank and an agreement with Ms. Gallagher to contribute her 50% co-owner interest to the bankruptcy estate, there would be only $5,240 of residual sale proceeds remaining after payment of the

two consensual mortgage liens.[14] Of the $5,240, half or $2,620 would go to Ms. Gallagher with respect to her interest as a co-owner in the real property. The other $2,620 would go to pay down the NYS Tax Liens of $380,540.31. The debtor, therefore, would not receive any payment from the sale of the real property in respect of his homestead exemption. This is the first scenario discussed earlier where the mortgage liens and the tax liens exceed the value of the real property and accordingly there is no equity for the debtor's homestead exemption. No purpose would be served by administering the real property under these circumstances as there is no benefit to the estate. As the Court stated above, bankruptcy courts generally will not authorize the sale of real property if the proceeds would only go to the secured creditors. *Stark*, 2022 WL 2316176, at *1. Moreover, under *Stark*, a trustee would not be permitted to negotiate a carve-out with one of the secured creditors for the benefit of the estate while denying the debtor a distribution on his homestead exemption. *Id.* at * 6.

Here, the trustee sought to augment the residual proceeds after satisfaction of the mortgage indebtedness. He first negotiated a resolution of the amount of the Flagstar Bank claim down to $75,000. The debtor characterizes this agreement as a "carve-out" maintaining that the additional residual proceeds of $57,715 ($132,715 minus $75,000) must be paid to the debtor for his homestead exemption. Under the debtor's analysis, for which he cites no authority, the tax lien claimant is cut out of the distribution scheme despite holding a third lien on the real property. The debtor's characterization of the reduction is misplaced. Flagstar Bank did not reduce its payoff to "give up" funds to allow the trustee to make a distribution to the bankruptcy estate. Rather, Flagstar Bank's cap on the recovery on its mortgage only results in more of the sale proceeds being available to the next secured creditor in line, New York with respect to the NYS Tax Liens, and to Ms. Gallagher with respect to her 50% co-

---

[14] There is no dispute that the second mortgage is senior to the NYS Tax Liens.

owner interest. Therefore, the claim reduction cannot be characterized as a carve-out for the benefit of the estate as the estate does not receive any benefit from the claim reduction – half of the amount of the reduction goes to Ms. Gallagher for her co-owner interest and the other half is distributed to the tax lien claimant. There is no equity created to which the debtor's homestead exemption could attach. Again, if there were only the mortgages and tax liens at play here, the trustee would not have sought to sell the real property as there would be no recovery for the benefit of unsecured creditors. Any recovery by Ms. Gallagher in this scenario is due to her interest as a co-owner of the real property, not in respect of her domestic support claim. The trustee would have walked away concluding that administering the asset does not provide a recovery to the estate even before he negotiated a claim reduction as there was no point in expending resources that would not result in a benefit to the estate.

Why then did the trustee not walk away? The answer lies in what makes this case distinguishable from *Stark*, to wit, the presence of both a domestic support obligation and the tax liens. This combination allows the trustee to administer property in which the estate has no equity for the express purpose of creating a recovery for the domestic support claimant and payment of administrative expenses through the statutory subordination of § 724(b)(2). Section 724(b) provides that residual sale proceeds that would have gone to pay the tax lien claimant should be first used to pay the domestic support claim; thus, the government steps aside in favor of the specified unsecured priority claims listed in § 724(b)(2), including the domestic support obligation, and the holders of the specified unsecured priority claims step into the shoes of the tax lien claimant. In short, the funds made available through the statutory subordination to pay the domestic support claim do not come from a carve out of the Flagstar Bank mortgage or from a voluntary "give up" by NYS Tax in respect of its tax lien. There is no agreement by NYS Tax to limit its recovery in favor of Ms. Gallagher or to

reduce its debt. Rather, NYS Tax is still entitled to recover the full amount owed it should

there be sufficient proceeds in the waterfall distribution. *See* 11 U.S.C. § 724(b)(5).

Section 724(b) provides as follows:

> Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title (other than to the extent that there is a properly perfected unavoidable tax lien arising in connection with an ad valorem tax on real or personal property of the estate) and that secures an allowed claim for a tax, or proceeds of such property, shall be distributed --
> 1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such lien;
> 2) second, to any holder of a claim of a kind specified in section 507(a)(1)(C) or 507(a)(2) . . . , 507(a)(1)(A), 507(a)(1)(B), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, to the extent of the amount of such allowed tax claim that is secured by such tax lien;
> 3) third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection;
> 4) fourth, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to such tax lien;
> 5) fifth, to the holder of such tax lien, to the extent that such holder's allowed claim secured by such tax lien is not paid under paragraph (3) of this subsection; and
> 6) sixth, to the estate.

11 U.S.C. § 724(b). Thus, under § 724(b)(1) sale proceeds subject to a consensual mortgage

lien senior to a tax lien shall be distributed first to the holder of the senior mortgage lien. In

this case, the first and second mortgages must be paid as they are senior to the NYS Tax

Liens.  This is not in dispute. What happens after that payment is what troubles the debtor.

Yet, a proper reading of the relevant Bankruptcy Code provisions would have dispelled any

notion by the debtor that he is deprived of his homestead exemption in favor of the payment

of unsecured priority claims, including a trustee's fees and expenses.

As discussed earlier in this opinion, the list of unsecured priority claims that take

precedence over payment of a tax lien pursuant to § 724(b)(2) is comprehensive and includes

a domestic support obligation. Thus, when faced with unsecured priority claims such as a domestic support obligation accorded a priority in payment under § 507(a)(1)(A) and (B), the trustee looks to the distributive scheme of § 724(b)(2) and funds that would otherwise go to the tax lien holder are allocated for payment of the domestic support obligation. Section 724(b)(2) "permits a Chapter 7 trustee to liquidate property subject to a tax lien and to distribute the proceeds to priority claimants before making any distribution to taxing authorities." *Laredo*, 334 B.R. at 412. In sum, § 724(b)(2) is a statutory subordination whereby Congress prioritized payment to the holders of specified unsecured claims ahead of the tax lienholder, thus subordinating the tax lien in favor of these creditors. *Morgan v. K.C. Machine & Tool Co. (In re K.C. Machine & Tool Co.)*, 816 F.2d 238, 244-45 (6th Cir. 1987). The distributive scheme employed by the trustee here conforms with the clear command of the statute. *See* 11 U.S.C. § 724(b)(2). Rather than abandon the property as having no equity, the trustee here sought to assure a distribution on a domestic support obligation, an obligation that is accorded privileged status in the Bankruptcy Code. He did this by employing the express subordination set forth in § 724(b)(2). *See K.C. Machine*, 816 F.2d at 247 ("We conclude that compelled abandonment is not available where administration promises a benefit to the estate. Administration promises a benefit in this case by virtue of 724(b).").

With that said, the Court finds the debtor's argument to be without merit. Most fundamentally, his contention that he is being deprived of his homestead exemption in favor of payment of unsecured priority claims is contrary to the central premise of the distributive scheme under § 724(b)(2): that the specified unsecured priority claims are paid before the tax lien holder. Both the text and purpose of that section compel the conclusion that the statutory subordination provides a benefit to the estate without infringing upon the debtor's homestead exemption.

For the debtor's sake, it bears repeating that the funds that would have gone to pay the NYS Tax Liens are instead applied to reduce Ms. Gallagher's domestic support claim and other specified unsecured priority claims. The NYS Tax Liens are not reduced by the amount paid to Ms. Gallagher or by payment of permitted administrative expenses. Rather, if funds remain after payment of Ms. Gallagher's domestic support claim and any other § 507(a) priorities that come within § 724(b)(2), then such residual is paid to the tax lien claimant as directed by, and in the manner provided in, §§ 724(b)(3), (4) and (5). Thus, the subordinated portion of the tax lien is preserved. Only where all the tax liens have been paid in full do we reach the debtor's homestead exemption. The homestead exemption in essence is in play after the payment of the remaining portion of the tax lien pursuant to § 724(b)(5) and before any distribution to the bankruptcy estate under § 724(b)(6). Where there are insufficient funds to pay the subordinated portion of the tax lien, then there are no funds to distribute to the estate under § 724(b)(6), much less pay the debtor his homestead exemption. *Laredo*, 334 B.R. at 413. Thus, it is clear from the express language of § 724(b)(2) that funds available for payment of a domestic support obligation and the permitted administrative expenses are not derived from a voluntary "carve out" or "give up" by a tax lien holder nor from the debtor's homestead exemption.

Furthermore, in seeking to maximize the distribution on Ms. Gallagher's domestic support obligation, the trustee did not stop with the agreement he reached with Flagstar Bank. He negotiated an agreement with Ms. Gallagher whereby she contributes her 50% co-ownership interest to the estate so that any recovery by her from the sale proceeds would be entirely with respect to her domestic support obligation. That inured to the debtor's benefit as it reduced the non-dischargeable domestic support obligation. Yet, even with both agreements in place, there are insufficient sale proceeds to pay Ms. Gallagher's domestic

support obligation or the NYS Tax Liens in full. As such, that leaves nothing to which the debtor's homestead exemption may attach.

Accordingly, the debtor's homestead exemption is simply not implicated because of the lack of equity. Where the encumbrances exceed the value of the property, § 724(b) does not alter what the debtor is entitled to receive from the sale proceeds, which in this case is nothing, but rather re-orders who gets a distribution as to the proceeds that are subject to a tax lien. There is no artificially created equity in this instance. To characterize it as such would provide the debtor a windfall at the expense of the NYS Tax Liens and the domestic support obligation that Congress clearly has prioritized ahead of the tax liens.

The debtor cites the decision of the Bankruptcy Appellate Panel of the Tenth Circuit in *Bird* in support of his contention that the trustee cannot use the subordination provision in § 724(b) to deprive the debtor of his homestead exemption. A careful reading of *Bird*, which dealt with two separate chapter 7 cases involving the same legal issue that were consolidated on appeal, shows that the facts are distinguishable, and *Bird* is not outcome determinative of the dispute here. The first debtor, John Bird, scheduled his residence as having a value of $240,400. The property was encumbered by (i) a first mortgage of $133,275.17, (ii) a second mortgage of $20,550.05, (iii) an IRS tax lien of $147,661.33, and (iv) judgments liens totaling $5,383.93. He claimed a homestead exemption of $30,000. The second debtors, Brent and Jo-Ann Christensen, scheduled their residence as having a value of $351,000. The property was encumbered by (i) a mortgage of $300,000; (ii) an IRS tax lien of $115,531.85, and (iii) a tax lien of $1,062.99 in favor of the Utah State Tax Commission. They claimed a homestead exemption of $51,000. The trustee in both cases objected to the claimed homestead exemptions, arguing that in each instance the property was overencumbered and there was no equity to which the homestead exemptions could attach. Notwithstanding the lack of equity, the trustee sought to sell the residences and negotiated stipulations with the IRS

pursuant to § 506(c) whereby the IRS consented to the sale of the residences pursuant to § 363(f) and agreed to "carve-out" $10,000 of the proceeds from the sale of each residence "for the benefit of bankruptcy estate to be distributed in accordance with the priorities of the Bankruptcy Code." *Bird*, 577 B.R. at 370. The trustee, thereafter, received offers for the residences that exceeded the encumbrances by a few thousand dollars. Notably, both Bird and Christensen lodged an objection to the sale of their respective residences and converted their chapter 7 cases to cases under chapter 13, thus enabling them to keep their residences as no sale did occur in the chapter 13 cases. The trustee and his counsel filed fee applications in each of the chapter 13 cases requesting compensation as an administrative expense entitled to a priority under § 507(a).  The court in *Bird* found that the trustee's services were not necessary because, in each instance, there was no equity for the estate as the value of the homesteads did not exceed the liens, and the trustee had no obligation to seek a carve-out from secured creditors and any such carve-out would not have resulted in a meaningful distribution to unsecured creditors. Moreover, the court noted that funds made available by the carve-outs would be applied toward payment of the debtors' claimed homestead exemption and not to the estate for distribution to unsecured creditors.

In the case before this Court, there are two critical differences from what occurred in *Bird*. First, there is no voluntary carve-out agreement with either Flagstar Bank or the New York State taxing authority for the benefit of the bankruptcy estate. As discussed above, where a secured creditor negotiates a "carve-out" or voluntary "give-up" for the benefit of the estate and equity is thus created where it otherwise did not exist because the property is overencumbered, that equity is subject to a debtor's homestead exemption. *Stark,* 2022 WL 2316176, at *6. Here, there is no "carve-out" or "give-up" by a secured creditor that artificially creates equity for the benefit of the estate and to which the debtor's homestead exemption may attach. The reconciliation of Flagstar Bank's claim and reduction in the amount to be

paid to it did not create equity. Rather, it served to increase what would otherwise be paid to the next junior secured claim in line, i.e., the tax lien claimant and, by reason of § 724(b)(2), additional sale proceeds are now available for distribution to Ms. Gallagher in payment of her domestic support claim. It bears repeating yet again that the statutory subordination in § 724(b)(2) is automatic and is not the product of a negotiated carve-out agreement between the trustee and NYS Tax, the tax lien claimant here. The motivation for the trustee in *Bird* to conduct the sale of the homesteads, notwithstanding the minimal equity, was primarily to benefit himself and his professionals from the carve-out negotiated with the IRS. That is in sharp contrast to what motivated the trustee in the case before this Court. The trustee's decision to seek a sale of the debtor's residence, which was not objected to by the debtor, was not driven by a desire to assure a payday for the trustee and retained professionals without conferring any benefit to the estate. Far from it. Here, the trustee's resolution of the claim asserted by Flagstar Bank and the Modified Stipulation with Ms. Gallagher, a stipulation that also included a cap on professional fees, was driven by his desire to maximize recovery on Ms. Gallagher' domestic support claim. This the trustee accomplished by adhering to the permitted distribution set forth in § 724(b)(2) and, simultaneously, recognizing the privileged status accorded by Congress to a domestic support obligation.

Second, in *Bird*, the debtors objected to the sale of their homestead, raising an issue as to whether a sale under § 363(f) may be permitted in the first place. That is not what occurred here as the debtor did not object to the sale itself, just the allocation of the sale proceeds. To support his view of the allocation of sale proceeds, the debtor points to the discussion in *Bird* where the Tenth Circuit Bankruptcy Appellate Panel rejects the trustee's argument that he is allowed to administer and sell exempt property over the objection of the debtors to create a fund to pay administrative expenses. 577 B.R. at 384. However, the debtor misconstrues the court's discussion on this salient point. In dealing with the sale objection,

as well as the objection to the allowance of any professional fees, the chapter 7 trustee in *Bird* argued that under § 724(b) a trustee is permitted to sell property free and clear of any interest, including a claimed homestead exemption, because allowed administrative expenses may be paid from proceeds designated for payment of the tax liens. The court in *Bird* correctly noted that while "[s]ection 724 indeed permits subordination of tax liens to the extent of administrative expenses[,] . . . the plain language of § 724 does not separately authorize sale of estate property. Instead, it sets forth a mandatory distributions scheme after an otherwise already authorized sale has been conducted. Section 363 is the only basis for authorizing Trustee to sell estate property." *Id.* at 385. The *Bird* trustee did not have authority under § 363 to sell the homesteads and a sale never occurred because the chapter 7 cases were converted to ones under chapter 13 of the Bankruptcy Code. Because there was no authorized § 363(f) sale, the statutory subordination in § 724(b)(2) was not implicated and could not be employed by the *Bird* trustee to provide a distribution for payment of administrative expenses and other unsecured priority claims. The court recognized that just because there is a tax lien against real property does not mean a trustee can simply use § 724(b) as authority to administer and sell property to provide recovery on the tax lien and thereby create a fund to pay administrative expenses. To do so ignores § 363(f) and the conditions that must be met before a trustee is permitted to sell property free and clear of any interest in such property. That is not debatable. But again, that is not what occurred here. The debtor's reliance on *Bird* is misplaced.

As this Court repeatedly explained to the debtor, the trustee did not seek authority to sell the residential real property solely to benefit secured creditors or pay administrative expenses, but rather to provide recovery to Ms. Gallagher on her domestic support claim. Without the presence of Ms. Gallagher's domestic support claim, the trustee's sale of the real property to provide a recovery on the secured claims and Ms. Gallagher's ownership interest

would have been impermissible. Moreover, the trustee's motion to sell at public auction the debtor's residence was authorized by this Court's August 25 Order. The debtor did not oppose the trustee's § 363 sale and when given the opportunity to file written opposition prior to the September 7, 2023 hearing to confirm the results of the auction sale to the highest bidder, the debtor did not do so. Thus, the debtor consented to the sale. His objection and argument at the August 24 Hearing (and in prior hearings) took issue with the distributive scheme proposed by the trustee pursuant to § 724(b)(2). That distributive scheme was likewise approved by the Court in the August 25 Order and paved the way for the trustee to proceed with the auction sale knowing that funds earmarked for the tax lien claimant would instead be applied toward payment of the domestic support claim and other unsecured priority claims specified in § 724(b)(2). Absent approval of the distributive scheme, the trustee would have surely sought to abandon the property and not proceed with the auction sale.

C.  Administrative Expenses under § 724(b)(2)

In the alternative, the debtor argues that should the Court allow the subordination of the tax liens to provide a recovery to Ms. Gallagher for her domestic support claim, the trustee and his professionals should not be allowed any compensation. The debtor's argument ignores the express language of § 724(b)(2). That section provides for a distribution "to any holder of a claim of a kind specified in section 507(a)(1)(C) or 507(a)(2)," e.g., administrative expenses, from the proceeds that would otherwise be paid in respect of an unavoidable tax lien. As discussed above, the distribution on a § 507(a)(1)(A) or (B) domestic support claim pursuant to § 724(b)(2) is *second* only to a claim allowed under § 507(a)(1)(C)[15] or 507(a)(2)[16].

---

[15] Section 507(a)(1)(C) states "[i]f a trustee is appointed or elected under section 701, 702, 703, 1104, 1202, or 1301, the administrative expenses of the trustee allowed under paragraphs (1)(A), (2), and (6) of section 503(b) shall be paid before payment of claims under subparagraphs (A) and (B), to the extent that the trustee administers assets that are otherwise available for the payment of such claims." 11 U.S.C. § 507(a)(1)(C).

[16] Section 507(a)(2) provides generally for the payment of "administrative expenses allowed under § 503(b)." 11 U.S.C. § 507(a)(2).

As explained earlier in this decision, the purpose of providing a first and senior priority for payment of administrative expenses relating to administering an asset subject to a tax lien is to ensure that a trustee is incentivized to administer the asset to provide a recovery for the specified unsecured priority claims in § 724(b)(2). That list, as the Court stressed above, is comprehensive and not surprisingly includes a domestic support obligation. Thus, in this case, § 724(b)(2) permits subordination of the payment of the tax lien to provide recovery for the domestic support claimant and to pay the administrative expenses incurred to administer the real property for the benefit of the holder of such priority claim, limited to the extent of the amount of the allowed tax lien. *Laredo*, 334 B.R. at 413 (finding that §§ 724(b) and 507(a)(1) – (7) provide for payment of real estate broker commissions "as well as other costs associated with closing and all administrative expenses incurred in connection with liquidation of the [p]roperty."). The administrative expense is shouldered by the tax lien claimant by reason of the automatic subordination under § 724(b) and the only parties affected by this distributive scheme are the priority and tax lien claimants. *Id.* at 412. The debtor's interest in any residual sale proceeds after payment of the consensual mortgages is not affected by the payment of the administrative expenses, as absent the mandated subordination the residual would have been paid to the tax lien claimant before any equity is available to pay a homestead exemption.

The Court also notes, as it did at the August 24 Hearing, that the priority accorded to administrative expenses under §§ 507(a)(2) and 503(b) includes taxes incurred by the estate. Section 507(a)(2) provides generally for the payment of "administrative expenses allowed under § 503(b)." 11 U.S.C. § 507(a)(2). Aside from the trustee's administrative expenses in liquidating the property under § 503(b)(1)(A), § 503(b)(1)(B), in turn, provides that "any tax incurred by the estate, whether secured or unsecured" is an allowed administrative expense

entitled to priority. 11 U.S.C. § 503(b)(1)(B).[17] Because § 503(b)(1)(B) does not limit any type of tax, other than a tax of the kind specified in § 507(a)(8), this would include any capital gains tax incurred by the bankruptcy estate from the sale of the real property. Indeed, the legislative history to § 503(b) provides "[i]n general, administrative expenses include taxes which the trustee incurs in administering the debtor's estate, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate during the case." S. Rep. No. 989, 9th Conf., 2d Sess. 66 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5852.

While the debtor represents that he wants the sale proceeds to pay down Ms. Gallagher's domestic support obligation claims as much as possible to reduce the garnishment of his social security benefits by the government, the only mechanism by which this can occur in the context of this bankruptcy case is to subordinate the NYS Tax Liens under § 724(b)(2) in favor of the domestic support obligations and the payment of administrative expenses all in keeping with the express language of § 724(b)(2). The Court has no authority to ignore or rewrite the statutory language.

The irony of the debtor seeking to deny the trustee his administrative fees and costs in liquidating the real property to maximize recovery to his ex-spouse on her domestic support claim is not lost on this Court. The debtor says the trustee should not be compensated for his work here, yet all the trustee's efforts thus far benefit the debtor the most. The trustee

---

[17] Section 503(b)(1)(B) allows an administrative priority claim for:

> (B) any tax –
> (i) incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or
> (ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case.

11 U.S.C. § 503(b)(1)(B).

negotiated the reduced payout on the second mortgage and obtained concessions from his professionals to cap the administrative fees and expenses associated with liquidating the property to maximize the distribution under § 724(b)(2) on Ms. Gallagher's nondischargeable domestic support obligation claim. The trustee negotiated the Modified Stipulation with Ms. Gallagher whereby she agreed to give up distribution of the sale proceeds in respect of her 50% co-ownership interest and allow use of those funds to reduce her domestic support claim. This agreement in turn reduces not only the nondischargeable domestic support obligation of the debtor but also the amount of the debtor's social security benefits that continue to be garnished because of his failure to pay spousal and, in particular, child support payments.

Given several explanations as to why this case comports with the stated purpose and policy of § 724(b)(2) and the privileged status accorded to a domestic support obligation, the Court remains at a loss as to the debtor's unwillingness to acknowledge what is being done for his benefit and that of Ms. Gallagher and their child, and his abject failure to acknowledge the clear mandate of § 724(b)(2) and the explicit reason why his homestead exemption is not implicated here.

V.    Conclusion

For all of the foregoing reasons, and for the reasons set forth on the record of the August 24 Hearing and as stated in the August 25 Order, the Court overruled the debtor's objection to the distributive scheme proposed by the trustee and granted the trustee's motion to sell the residential real property at public auction and distribute the residual sale proceeds in accordance with § 724(b).

Dated: October 25, 2023
      Central Islip, New York

Louis A. Scarcella
**Louis A. Scarcella**
**United States Bankruptcy Judge**